**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GEORGE KERITSIS, Derivatively on Behalf of ARCHER-DANIELS-MIDLAND COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. |
| JUAN R. LUCIANO, MICHAEL S. BURKE, THEODORE COLBERT, III, JAMES C. COLLINS, JR., TERRY CREWS, ELLEN de BRABANDER, SUZAN F. HARRISON, PATRICK J. MOORE, DEBRA A. SANDLER, LEI ZHANG SCHLITZ, KELVEN R. WESTBROOK, VIKRAM LUTHAR, and RAY YOUNG | ) ) ) ) ) ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants, | ) ) | |
| and | ) ) | |
| ARCHER- DANIELS-MIDLAND COMPANY, | ) ) | |
| Nominal Defendant. | | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff George Keritsis ("Plaintiff") by his attorneys hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") against Defendants (defined below) named herein. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This Complaint is also based on the investigation of Plaintiff's counsel, which included a review of, among other things, public filings with the U.S. Securities and Exchange Commission ("SEC"), news reports, press releases, related litigation and other public sources.

1

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought for the benefit of Archer-Daniels-Midland-Company ("ADM" or the "Company") against Defendants (defined below) for breaches of their fiduciary duties owed to the Company.

2.      According to its SEC filings, ADM is a global agricultural supply chain manager and processor that operates through three main business segments: Ag Services and Oilseeds (this segment includes global activities related to the origination, merchandising, transportation, and storage of agricultural raw materials, and the crushing and further processing of oilseeds such as soybeans and soft seeds (cottonseed, sunflower seed, canola, rapeseed, and flaxseed) into vegetable oils and protein meals); Carbohydrate Solutions (this segment is engaged in corn and wheat wet and dry milling and other activities); and Nutrition (this segment is engaged in the manufacturing, sale, and distribution of a range of ingredients and solutions, including plant-based proteins, natural flavors, flavor systems, natural colors, emulsifiers, and other specialty food and feed ingredients).

3.      Over the past decade, ADM has spent billions of dollars trying to expand its Nutrition business to protect against commodity price volatility in its legacy agricultural commodities trading business. The Company first acquired WILD Flavors in 2014 for $3 billion. With an eye toward gaining a greater foothold in the Nutrition business, ADM ended 2023 with two major acquisitions – dairy flavoring maker Revela Foods and UK-based functional ingredients producer and a leading developer and producer of premium flavor, FDL.

4.      However, ADM's string of investments in animal feed and pet nutrition did not meet expectations which ultimately led to increased pressure of ADM's Nutrition which resulted

from weak demand for meat alternatives and other products as well as downtime at a large soy processing facility.

5.      In October 2023, ADM reported that Nutrition revenues had decreased 4% to $1.8 billion due to lower sales volumes, Nutrition operating profit had decreased 22%, and both Human and Animal Nutrition results were lower compared to the third quarter of 2022.

6.      Defendants made false and/or misleading statements, as well as failed to disclose material facts, about the performance and prospects of ADM's Nutrition segment and its accounting practices. Specifically, Defendants made positive statements about the Nutrition segment as a future profit-driver for the Company, with the ability to capitalize on healthier eating trends and rising consumer demand for natural ingredients and flavoring. Defendants also created the impression that the Nutrition segment's growth would provide more diversification and earnings stability for ADM.

7.      In reality, the Nutrition segment's robust growth from 2020 through 2022 was inaccurate as a result of improper accounting practices. Defendants also downplayed the segment's eventual decline in 2023. As ADM was aggressively acquiring companies to expand its capabilities in Nutrition, investors were under the impression that the segment was growing rapidly. Behind the scenes, Defendants' accounting practices for the Nutrition segment misrepresented its true financial results and prospects, including its operating profits ("OP") and as a result, ADM's business and prospects were much worse than represented, which caused the price of ADM common stock to trade at artificially inflated levels.

8.      The Company, through Defendants, created the appearance of a profitable and diversified business by inflating the performance of the Nutrition segment. As further detailed herein, senior Company executives were incentivized by stock awards that were directly tied

to the performance of the Nutrition segment from 2020 to 2022 that resulted in stock payouts valued at over $70 million, with additional payouts to be doled out this year.

9.      On January 21, 2024, ADM announced that it had placed its Chief Financial Officer and Senior Vice President, Vikram Luthar ("Luthar"), on leave effective immediately. The Company further announced that Luthar's "leave is pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee regarding certain accounting practices and procedures with respect to ADM's Nutrition segment, including as related to certain intersegment transactions." The Company also revealed that its investigation was initiated in response to its receipt of a voluntary document request by the SEC. As a result, ADM delayed its Q4 and FY 2023 earnings release and withdrew its outlook for the Nutrition segment. Lastly, the Company announced the same day that the Board appointed Ismael Roig to serve as the Company's Interim CFO while Luthar is on administrative leave.

10.      Ultimately the Company revised six years' worth of financial statements related to its Nutrition segment. Revised financial statements showed that ADM had overstated the Nutrition segment's annual operating profit by as much as 9.2% in that time.

11.      In connection with the Company's internal investigation, the Company identified certain intersegment sales that occurred between the Company's Nutrition reporting segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions reporting segments that were not recorded at amounts approximating market. Furthermore, in connection with its internal investigation, the Company identified a material weakness[1] in its internal control over financial

---

[1] A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

reporting related to its accounting practices and procedures for intersegment sales. The material weakness resulted from inadequate controls that allowed for certain intersegment sales to be reported at amounts not approximating market.

12.     On February 5, 2024, the Company announced that the U.S. Department of Justice ("DOJ") initiated a criminal probe into the Company's accounting practices and the DOJ directed grand jury subpoenas to certain current and former employees.

13.     Defendants' egregious misconduct has subjected the Company and its certain of its officers to several securities fraud class action lawsuits (collectively, the "Securities Class Actions").

14.     Despite the Company's internal investigation, the Board has failed, *inter ali*a, to: a) issue any detailed reports of the Company's purported findings of its internal investigation; b) terminate anyone in connection with its internal investigation, including announcing whether Defendant Luthar will remain on administrative leave or will be terminated for cause; and c) recoup any performance-based compensation paid to senior executives.

15.     As a result of the foregoing, the price of ADM common stock declined by $16.23 per share, or approximately 24%, from $68.19 per share to close at $51.69 on January 22, 2024, wiping out approximately $8.8 billion of ADM's market capitalization and shareholder equity. This was the Company's largest one-day decline since November 13, 1929, which was two weeks after the market crash of 1929.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

18.     This shareholder derivative action is not a collusive action designed to confer jurisdiction on a court of  the United States that it would not otherwise have.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, nominal defendant is incorporated in this District and conducts business in this District.

## PARTIES

20.     Plaintiff is and was at all relevant times a shareholder of Nominal Defendant, ADM.

21.     Nominal Defendant ADM is a Delaware corporation with its headquarters located at 77 West Wacker Drive, Suite 4600, Chicago, Illinois.

22.     Defendant Juan R. Luciano ("Luciano") has served as Chair of the Board since January 2016, President since 2014 and Chief Executive Officer ("CEO") since January 2015.   In 2011, Luciano joined ADM as Executive Vice President and Chief Operating Officer.

23.     Defendant Michael S. Burke ("Burke") has served on the Board since May 2018. Burke serves as Chair of the Audit Committee and is a member of the Executive and Nominating and Corporate Governance Committees.

24.     Defendant Theodore Colbert III ("Colbert") has served on the Board since May 2021.  Colbert is a member of the Audit Committee and Compensation and Succession Committee ("Compensation Committee").

25.     Defendant James C. Collins Jr. ("Collins") has served on the Board since August 2022.  Collins is a member of the Compensation Committee and Sustainability and Corporate Responsibility Committee.

26.     Defendant Terry Crews ("Crews") has served on the Board since May 2011.  Crews is a member of the Executive Committee.

27.     Defendant Ellen de Brabander ("Brabander") has served on the Board since 2023. Brabander is a member of the Audit Committee and Sustainability and Corporate Responsibility Committee.

28.     Defendant Suzan F. Harrison ("Harrison") has served on the Board since May 2017. Harrison serves as the Chair of the Sustainability and Corporate Responsibility Committee and is a member of the Audit Committee and Executive Committee.

29.     Patrick J. Moore ("Moore") has served on the Board since November 2023.   Moore serves as Chair of the Nominating and Corporate Governance Committee ("Governance Committee").  Moore is also a member of the Executive Committee and Audit Committee.

30.     Debra A. Sandler ("Sandler") has served on the Board since May 2016.  Sandler serves as a member of the Audit Committee and the Governance Committee.

31.     Defendant Lei Zhang Schlitz ("Schlitz") has served on the Board since May 2019. Schlitz is a member of the Compensation Committee and the Sustainability and Corporate Responsibility Committee.

32.     Defendant Kelvin R. Westbrook ("Westbrook") has served on the Board since November 2003.  Westbrook is Chair of the Compensation Committee and is a member of the Executive Committee and Corporate Governance Committee.

33.     Defendant Luthar served as Chief Financial Officer ("CFO") of ADM beginning in April 2022 and as Senior Vice President of ADM beginning in March 2015, until he was placed on administrative leave on January 21, 2024. Luthar previously served as Chief Financial Officer of ADM's Nutrition business segment from January 2020 to April 2022.

34.     Defendant Ray Young ("Young") served as CFO of ADM from December 2010 until April 2022. After Luthar was appointed CFO, Young assumed the position of Vice Chairman of ADM before he retired at the end of 2022.

35.     Defendants Luciano, Burke, Colbert, Collins, Crews, Brabander, Harrison, Moore, Sandler, Schlitz, Westbrook, Luthar and Young are collectively referred to herein as the "Defendants" or the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By virtue of their positions as officers and directors of ADM, and because of their ability to oversee, direct, and control the business and corporate affairs of ADM, Defendants owed ADM and its stockholders fiduciary obligations of good faith, loyalty, and candor, and they were required to do their utmost to control and manage ADM in a fair, just, honest, and equitable manner. Defendants were required to act in the best interests of ADM and its stockholders and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to ADM and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. Defendants' neglect of their duties to the Company in essence decimated their duty of oversight.

37.     Defendants, because of their positions of control and authority as directors or officers of ADM, directly or indirectly exercised control over the wrongful acts complained of

herein.  Because of their advisory, executive,  managerial and directorial positions within ADM,

each of the Defendants had knowledge of material, nonpublic information regarding the Company.

38.     In the discharge of their duties, Defendants were required to exercise reasonable

and prudent supervision over management, policies,  practices, and controls of the financial affairs

of ADM.  ADM represents that its directors are expected to spend the time and effort necessary to

properly discharge their responsibilities, which specifically include:

- exercising their business judgment in good faith;

- acting in what they reasonably believe to be the best interest of all
  stockholders;

- becoming and remaining well-informed about the Company's business and
  operations and general business and economic trends affecting the Company;

- and ensuring that the business of the Company is conducted so as to further the long-
  term interests of its stockholders.

## SUBSTANTIVE ALLEGATIONS

### Background of ADM and its Aggressive Acquisition Strategy

39.     ADM[2] is a multinational food processing and commodities trading corporation that

engages in the production of oilseeds, corn, wheat, cocoa, and other agricultural commodities.

According to its SEC filings, the Company operates through three main segments: Ag Services

and Oilseeds, Carbohydrate Solutions, and Nutrition. The Ag Services and Oilseeds segment

includes activities related to the origination, merchandising, transportation, and storage of

agricultural raw materials, and the crushing and further processing of oilseeds such as soybeans

---

[2] ADM was the subject of a nonfiction book titled "The Informant" in 2000 and an ensuing film
starring Matt Damon, about a 1990s price-fixing scheme for the animal feed additive lysine.
Three ADM executives were convicted and the Company paid approximately $100 million in
fines, at the time the largest criminal antitrust fine ever.

and soft seeds cottonseed, sunflower seed, canola,  rapeseed, and flaxseed into vegetable oils and protein meals. The Carbohydrate Solutions segment mainly consists of corn and wheat wet and dry milling, and the Nutrition segment serves various end markets including food, beverages, nutritional supplements, and feed and premix for livestock, aquaculture, and pet food. Before increasing its focus on nutrition, ADM's business primarily focused on buying, selling, and processing raw materials such as soy and cornbeans.

40.     Historically, ADM and its two primary competitors, Bunge Global SA and Cargill Inc., focused on buying, storing, and selling grain and profiting from exclusive information about supply and demand. As technology advanced and facilitated the spread of information, ADM and its competitors sought to diversify their business. Cargill entered the meat processing business and ADM expanded into nutrition, increasing its focus on providing customers with products to help them change the formulation of processed food, such as reducing sugar content while preserving sweetness, or alter its appearance. Currently, ADM's historical business is also facing the threat of increased competition for soybeans processing in the United States, as well as declining margins for soybean crushing and ethanol, for which ADM is the third-largest United States producer. As a result, successful diversification and growth of the Nutrition segment would continue to benefit ADM's revenue and stability.

41.     ADM began ramping up growth in the Nutrition segment, beginning with the $3 billion acquisition of WILD Flavors in 2014, which remains the Company's largest acquisition to date. ADM also completed a $1.8 billion acquisition of Neovia, an animal feed maker, in February 2019.

42.     With an eye toward gaining a greater foothold in the Nutrition business, ADM ended 2023 with two major acquisitions – dairy flavoring maker Revela Foods and UK-based functional ingredients producer and a leading developer and producer of premium flavor, FDL.

43.     The FDL acquisition, enabled ADM to expand its range of flavors and functional ingredients, concurrently enhancing FDL's portfolio of taste and nutritional solutions.  Calvin McEvoy, president of global flavors at ADM, said: "Our ongoing investments to add to our flavours portfolio are helping power our strategic work to build a global leader in nutrition. FDL's innovative and agile formulation knowledge, deep end-use applications expertise and strong customer base make them a great addition to ADM's global flavour capabilities."

44.     In a press release dated December 18, 2023 announcing the acquisition of Revela Foods, a leader in the dairy ingredients space, ADM stated that, "[o]ur flavors business is an important pillar of our Nutrition growth strategy, and we are continuing to add to our flavors pantry to ensure we remain the partner of choice for customers around the globe."

45.     ADM further touted the growth to its flavors portfolio through acquisitions, "including savory via Eatem Foods; citrus via Florida Chemical Company and Erich Ziegler Citrus; and vanilla via Rodelle" and stated that it "expanded  its  flavors  capabilities  globally"  with acquisitions including Flavor Infusion South America,  organic investments including facilities in China  and  Germany,  and  a  "growing  network  of  innovation centers spanning Europe, Asia, Latin America and North America."

**The Board and Senior Management Failed to Ensure that the Financial Reporting of ADM's Nutrition Segment was Accurate and Reliable**

46.     In February 2020, ADM reported that Nutrition operating profit increased 23%, compared to a 9% increase the previous year. One month later, in March 2020, ADM disclosed changes to the short-term and long-term incentive compensation plans for performance periods

beginning in 2020 that were "designed to emphasize our focus on the Nutrition segment of our business." In January 2021, Defendant Luciano advertised that ADM's Nutrition business was expected to enter a period in which annual operating profit growth would average 15%, and operating earnings for the Nutrition segment indeed rose more than 20% that year. Despite Defendants' representations to the contrary, that growth was clearly not sustainable. In 2022, the Nutrition operating profit was only 7%, and earnings dropped by approximately one fifth in 2023.

47.     Despite these results, Defendant Luthar reported that he expected continued growth in the Nutrition revenue opportunity pipeline in October 2023, "with significant conversions continuing as ADM moves past some near-term demand weakness." ADM also continued to push forward with its aggressive M&A strategy, announcing two additional acquisitions for the Nutrition segment in December 2023, Revela Foods and FDL. In a press release announcing the Revela Foods acquisition on December 18, 2023, ADM touted its prior flavors investments, stating, "ADM is continuing to add to its broad portfolio of flavor ingredients and solutions as it builds a global leader in nutrition."

48.     In reality, Defendants were not in a position to make such statements about ADM's prospects in the Nutrition segment. As a result of Defendants' misleading statements and omissions, investors were unaware that ADM's accounting practices hid the true performance and growth of the Nutrition segment and impacted the accuracy and reliability of ADM's financial statements.

49.     On April 30, 2020, ADM held an earnings call regarding its financial results for the first quarter of 2020. During the call, Defendant Young stated the following:

> ***Nutrition continued its growth trajectory with record results. Our Human Nutrition business, formerly known as WFSI, delivered strong performance and growth across the broad portfolio, including Flavors, Specialty Ingredients and Health & Wellness. Increased sales revenue in North***

***America and EMEA flavors, continued sales growth in alternative proteins
and additional bioactives income helped drive improved results***. As Juan
mentioned earlier, we did see higher demand in some Human Nutrition areas
as a result of new wins as well as some pantry loading effects. Animal
Nutrition's improved year-over-year results  were driven by a strong
performance from Neovia, good volumes and margins in feed additives and
solid sales in pet care. The prior year quarter also had been negatively
impacted by about $10 million in upfront purchase price adjustments related to
Neovia. Amino acids were negatively impacted by a year-over-year decline
in the global pricing environment, though prices were directionally improved
over Q4 of 2019. We are also very pleased that we met our Neovia synergy
targets more than 2 years early.

50.     Defendant Young further stated: "For Nutrition, we feel confident that the business

will continue to advance to another calendar year of 20%-plus growth." In response to an analyst's

question about the growth of the Nutrition business, Defendant Luciano stated:

When talking about Nutrition, I said to all our investors over the last 1.5
years that they've been supporting us through all the investment phase in
Nutrition. And Nutrition have not been showing that in the P&L because this was
organic growth, and we have some growing pains into some of these assets as
you build them and you have to finance them. But when you see now what's
starting to happen is what  we predicted before, is all those wins, all that
innovation, we always said, we have our value proposition is resonating with our
customers. We had that. That line was a little bit masked by all this organic growth
that was coming. ***Now all that organic growth is hitting the P&Ls because these
investments are maturing. And you're going to see that, and we grew 23% profit
last year. We are growing – we're going to grow another north of 20% this year.***
You see WFSI during this. So take Neovia and Animal Nutrition out for a minute
since the first quarter is a little bit of a strange  comparison because we acquired
this last first quarter. So -- but if you take WFSI,  WFSI has grown earnings at
28% in the first quarter. So we continue a little bit the rhythm of 23% that we
delivered last year. And flavors are growing at revenue at 7.8%. So we feel very
good about that business. It's a very diversified business. And if anything, we're
experiencing COVID with people that come back from this pandemic, like we've
seen in Asia, is that people come back with the more -- with an enhanced focus
on health and the importance of quality nutrition for their well- being. So we've
seen the probiotics.

Our Health & Wellness segment is up, like, 24% in terms of revenue, because the
sales of those products are -- for humans is, has been probably reemphasized by
all this COVID. So we think that we are in the right segments. We think we have

the right product mix. So we feel very bullish about continuing this performance for the Nutrition business.

51.     In an earnings call on July 30, 2020, Defendant Young stated:

Our Nutrition business continued to deliver significant growth, with 35% year-over-year profit improvement for the quarter. ***Over the first half of the year, adjusted profit for Nutrition is up more than 50%.*** And despite some COVID-19 impacts, revenue is up about 8% on a constant currency basis, with growth spread across the entire broad portfolio. Human Nutrition results were substantially higher in the second quarter of 2020 versus the second quarter of 2019.

52.     On the same call, in response to an analyst's question about Nutrition's role "as a contributor to the overall company over the long run[,]" Defendant Luciano stated:

Yes. Strategically, Eric, I always have -- we always have 2 north, if you will. One is we want to get to the 10% ROIC. And the second is we saw the opportunity to bring growth into the company with extending our value chain into Nutrition. And we always say, you heard me saying, we think that that's a business that could get easily to 25%, 30% of our profits, and it continues to move into that. And to be honest, it's moving probably accelerated -- has accelerated into that number. So we might revisit that number. So we don't have a specific number. But all I wanted to express at that point in time is it will be a meaningful contributor because we saw the opportunity. We saw the potential for that business. And now I think that everybody else is realizing.

At the beginning, we were in an investment phase. So to a certain degree, some of that performance was masked. But now we're looking at what we are doing in-- look at WFSI. WFSI grew 27%. Of course, Animal Nutrition grew much more than that. And when we look at all the microbiome potential there, that's an incredible accelerator that is still very small. So I think I answered all before to Ken. You have to remember, this is at the beginnings of what we can uncover in terms of profitability. We are just delivering while we are building the business. But there is much more that will come from Nutrition. And I think that if our track record serves us in giving you confidence, trust us, much more is coming from Nutrition.

53.    On February 18, 2021, Defendants caused the Company to file its Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Luciano, Young, Harrison, Moore, Sandler, Burke, Crews, Schlitz and Westbrook.  The 2020 10-K stated that, "Nutrition revenues increased 2% to $5.8 billion due to higher sales prices ($0.1 billion)." The 2020 Form 10-K further stated:

> ***Nutrition operating profit increased 37%. Human Nutrition delivered strong performance and growth across its broad portfolio***. Strong execution to meet rising customer demand for plant-based proteins and edible beans drove higher results in Specialty Ingredients. Additional income from fermentation and strong sales for probiotics and fiber drove higher performance in Health & Wellness. Flavors continued to deliver strong results. Animal Nutrition results improved year-over-year driven by strong performance from Neovia, good margins in commercial and livestock premix, and improved margins in amino acids.

54.    In an earnings call on October 26, 2021, Defendant Young stated that "the Nutrition business remains on its solid growth trajectory with 17% higher revenues and 15% on a constant currency basis and 20% higher profits year-over-year and continued strong EBITDA margins." Defendant Young further stated that: "Looking ahead, we expect Nutrition to continue on its impressive growth path, with strength across the Human and Animal Nutrition leading to strong year-over-year earnings expansion in the fourth quarter and a 20% full year growth versus 2020." Defendant Luciano affirmed Nutrition's growth, stating: "Nutrition will continue on its strong growth trajectory, in line with our 15% per annum trend rate goals and on its way to $1 billion in operating profit in the coming years."

55.    On February 17, 2022, Defendants caused the Company to file its Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 Form 10-K was signed by Defendants Luciano, Young, Burke, Colbert, Harrison, Moore, Sandler, Westbrook, Crews and Schlitz. The 2021 10-K stated, , "Nutrition revenues increased 16% to $6.7 billion due to higher sales prices

($1.0 billion),  partially offset by lower sales volumes of ($0.1 billion)." The 2021 10-K further represented:

> Nutrition operating profit increased 20%. Human Nutrition results were higher than the prior year. Flavors results were up, driven by strong sales across various market segments. In North America and EMEAI, the flavors business delivered strong volumes and improved product mix, particularly in the beverage segment. Specialty Ingredients delivered sales growth in specialty proteins and improved pricing and product mix, though results were negatively impacted by the effects of higher production costs, normalization of prices in the wholesale ingredients business, and COVID-related shifts in demand across the portfolio. Health and Wellness results were strong, with robust demand driving strong results in probiotics and fibers. Animal Nutrition results were higher on favorable results in amino acids, driven by improved margins and product mix, partially offset by lower demand and higher input costs as a result of pandemic effects in South America and Asia.

56.     During an earnings call on October 25, 2022, Defendant Luthar stated "we expect the fourth quarter for Nutrition this year to be higher than the fourth quarter of 2021, with continued strong demand in Human Nutrition more than offsetting adverse currency effects.  We expect Nutrition's full year OP growth to be between 15% and 20% on a constant currency basis." In response to an analyst's question about ongoing momentum for 2023, Defendant Luciano stated:

> We see, as Vikram expressed before, a positive outlook for starches and sweeteners. We have finished some of our contracting, and we see the volume and we see the margins holding or slightly expanding there. ***And we see a continuation of our growth trajectory in Nutrition. When I talk about the pipeline, that's the business in which we have the biggest visibility into the future because these are projects  that -- barring any supply issues, we will bring to the P&L***. So I would say, that is  what's -- give us some positive momentum or positive expectations for '23.
>
> And as I explained in the Nutrition question, we have new capacity coming on stream. We have -- we are expanding Biopolis probiotics capacity by a factor of 5. We are bringing a new line for  plant-based proteins in Sojaprotein. We  are expanding our PetDine capacity***. So we are bringing a lot of new capacity to bear  because we have the pipeline to actually transfer them into profits***. So from what  we can see here, and again in a very uncertain world, is we

have good -- very good momentum going into 2023.

57.     On February 14, 2023, ADM filed its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 Form 10-K was signed by Defendants Luciano, Luthar, Burke, Colbert, Harrison, Moore, Sandler, Schlitz, Westbrook, Collins and Crews.   The 2022 10-K stated, "Nutrition revenues increased 14% to $7.6 billion due to higher sales prices ($0.2 billion) and higher sales volumes ($0.7 billion)." The 2022 10-K further stated:

> ***Nutrition operating profit increased 7%. Human Nutrition delivered higher year- over-year results.*** Flavors results were lower driven by demand fulfillment challenges, the impact of the strong U.S. dollar in EMEA, softer demand in Asia Pacific, and higher costs in North America. Strong sales growth in alternative proteins, including contribution from the Sojaprotein acquisition, and good demand for texturants offset some higher operating costs to help deliver better year-over- year results in Specialty Ingredients. Health and Wellness was also higher year- over-year, powered by probiotics, including the contribution from the November 2021 Deerland Probiotics and Enzymes acquisition, and robust demand for fiber and Vitamin E. ***Animal Nutrition profits were higher than the prior year due primarily to strength in amino acids.***

58.     During an earnings call on January 26, 2023, Defendant Luciano represented that: "Our Nutrition business continued to outpace the industry, with 18% constant currency revenue growth for the full year. We delivered an impressive 26% year-over-year revenue growth in BioSolutions. The portfolio of acquisitions we made in the prior year continued to deliver OP above our financial projections."

59.     On the same call, in response to an analyst's question about OP growth, Defendant Luciano stated:

> [Y]ou've been witnessing how we built this Nutrition business over the years. ***This is a business that, if I take out the last 3 years, it has been growing OP by 20%,*** CAGR, if you will. So it's a business that we continue to add layers of capabilities so we can continue to win at the customer front, whether it's we go from individual ingredients to systems, where we bring functionality to those systems through bioactives, whether we bring sustainability benefits to that

through our decarbonization or Regen Ag.

So we continue to add layers to continue to help customers excel at the consumer level. And we see that in our win rates, and we see that in our pipeline. So we have visibility into that. As Vikram said, maybe some of the categories soften a little bit, *but our ability to gain share, to win faster than those categories has been demonstrated. I think this year, we grew revenue significantly higher than the market. So when we look forward, as I said in my -- I think one of the earlier answers, we continue to expect bolt-on and M&A -- bolt-on M&A and organic growth.* We had 4 companies in 2021. *We're building capabilities and new capacity in 2022 that we're going to see onstream in '23, and we're going to continue to grow that.*

60.     In an earnings call on April 25, 2023, Defendant Luciano continued to tout ADM's growth in Nutrition, stating that, "Nutrition's growth trajectory for the year remains on course with a double-digit increase in our human Nutrition pipeline compared to this point in 2022." In response to an analyst's question about Nutrition's profits for the year, Defendant Luthar stated: "In Human Nutrition, as we mentioned, we've got a strong pipeline." He attributed an expected slowdown in the first half of the year to Animal Nutrition, but assured investors that "we feel good about Animal Nutrition from a turnaround perspective…we feel strong and good about the 10% plus constant currency OP growth in Nutrition for 2023."

61.     In an earnings call on July 25, 2023, Defendant Luciano stated: *In Nutrition, our unique go-to-market strategy continues to drive a larger sales pipeline and deliver double-digit growth in the Flavors business*[.]" Defendant Luthar reaffirmed the growth of Nutrition, stating:

*When looking at Nutrition as a whole, we now expect 2023 results to be similar to the prior years as we expect growth in Human Nutrition to be offset by lower results in Animal Nutrition.* However, given the increase in customer innovation we've seen in our Flavors business and our recent wins in pipeline growth across Human Nutrition, as well as the actions we are taking in Animal Nutrition, we remain confident about the future outlook and growth prospects for Nutrition.

62.     Defendant Luthar also touted ADM's progress in Flavors in response to an analyst question about the Nutrition segment, stating:

> Flavors. Strong pipeline and win rates. We talked about the largest ever pipeline we've had. Flavors actually grew profits in the first half 9%, 20% in Q2. So that's a very good sign of the recovery we are seeing in parts of the Human Nutrition business. ***The other thing that's important to note, Flavors actually contributed almost 50% of the overall operating profit for Nutrition in the first half. So that's an important signal as you think about the future growth of Nutrition.*** Yes, that was primarily driven in the beverage category, but we see green shoots of opportunity in the food category as well.

63.     In response to an analyst question about "the pathway '24, '25 and kind of the achievability of the prior 2025 target, I believe, $1.2 billion of OP in that [Nutrition] segment[,]" Defendant Luciano stated in pertinent part:

> In the Human Nutrition, margins are much higher and is [sic] continue to make it better and more stickier to customers as we develop better solutions. In Animal Nutrition was a margin up story since they were coming from lower margins. So when you think about our numbers are a combination of applying our growing faster than market and our EBITDA margin on sales to a market number. Of course, this industry, as you can see by ourselves and our competitors is having through tough times, whether it is because customers are either not innovating fast enough or destocking at this point in time and making sure they have their supply chains in order.
>
> ***So to the extent that those projections are going to be reduced, our percentages of applied to those numbers will be a smaller number. So we haven't gone through that because, to be honest, we are looking at how do we address our current challenges. So we're not that worried about 2025 right now, we want to make sure we make all the adjustments that we need to make.*** And maybe as we talk about the adjustment, let me talk a little bit about Animal Nutrition. Animal Nutrition, as we become more into the business, if you will. We know there is a commodity part, and there is a specialty part. The specialty part matches very well with the -- what the playbook that we have in the human side. And that part is growing and we will continue to accelerate. And Vikram said before, we are repurposing resources to add more of that.

64.     In an earnings call on October 23, 2023, Defendant Luthar stated:

> The plant-based protein market has been experiencing destocking and consumer demand softness over the course of the year that will likely persist into next year. Given these recent market dynamics, we have re-scoped our Decatur protein

modernization investment project to better match the expected lower growth demand environment. Also, we are leveraging our expertise in creation, design and development to differentiate our product offerings to serve evolving consumer needs. ***These adjustments will enable a faster pivot to higher growth and more resilient categories such as specialized nutrition, which have synergies across the Nutrition portfolio, and we are rapidly building this revenue pipeline.***

Health and Wellness results were higher year-over-year due to double-digit biotech sales and a favorable impact related to the revised commercial agreement with Spiber. ***During the quarter, we realized a significant expansion in our revenue pipeline reinforcing the demand for evidence-based solutions.***

In Animal Nutrition, we are beginning to see the cost optimization actions and the expansion of offerings in the specialty feed and ingredient space from earlier this year, driving improved performance. However, the recovery in the base business was more than offset by normalized year-over-year amino acids margins as well as lower profit contribution from the Pet Solutions business.

Looking forward, we anticipate Flavors to finish the year strong driven by growth in EMEA and North America. Health and Wellness operating profit is expected to finish similar to last year. Animal Nutrition operating profit is expected to continue to recover sequentially quarter-over-quarter. Specialty Ingredients operating profit is expected to be down significantly, impacted by the recent Decatur East incident and demand softness.

***All in, we now expect full year 2023 operating profit for Nutrition to be around $600 million. While our results in 2023 have been below our expectations, we expect Nutrition to return to growth in 2024.***

We will continue to build on the Flavors momentum from 2023. Health and Wellness should maintain its steady performance. The cost actions in the shopper pivot to higher-margin products will enable Animal Nutrition to drive growth, further reinforced by improved go-to-market capabilities.

65.     Defendant Luthar then announced a raised 2023 earnings outlook, stating: "Even with the softness in Nutrition, and lower-than-expected profit contributions from Wilmar, we are raising our 2023 earnings outlook again and now anticipate full year EPS in excess of $7 per share." Defendant Luciano affirmed:

***For Nutrition, we expect continued growth in our revenue opportunity pipeline with significant conversions continuing as we move past some near-term demand weakness.*** Our expanding results in Flavors continue to signal

acceleration across our broader portfolio. We expect the positive revenue growth trends in Health and Wellness to drive into next year, and we're already pivoting Specialty Ingredients towards high potential areas like alternative daily and specialized nutrition.

66.     The statements referenced above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to ADM's Nutrition segment and accounting practices, which were known to Defendants or recklessly disregarded by them as follows:

> a)     that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate representation of ADM's performance and future prospects, including reported operating profits;
>
> b)     that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to ADM's business; and
>
> c)     that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about ADM's Nutrition segment and related financial results, growth, and prospects.

**ADM Announces Delay of its Q4 and FY 2023 Earnings Release Amid SEC Investigation**

67.     On January 21, 2024, ADM announced that it had placed its Chief Financial Officer and Senior Vice President, Luthar on leave effective immediately. The Company further announced that Luthar's "leave is pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee regarding certain accounting practices and procedures with respect to ADM's Nutrition segment, including as related to certain intersegment transactions." The Company also revealed that its investigation was initiated in response to its receipt of a voluntary document request by the SEC.

68.     As a result, ADM delayed its Q4 and FY 2023 earnings release and withdrew its outlook for the Nutrition segment.  Lastly, the Company announced the same day that the Board appointed Ismael Roig to serve as the Company's Interim CFO while Luthar is on administrative leave.

69.     Ultimately, in connection with the Company's investigation, the Company identified certain intersegment sales for the years ended December 31, 2021 through 2023 that occurred between the Company's Nutrition segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions segments that were not recorded at amounts approximating market.

70.     In connection with its internal investigation overseen by the Audit Committee, the Company identified a material weakness in its internal control over financial reporting related to its accounting practices and procedures for intersegment sales. The material weakness resulted from inadequate controls that allowed for certain intersegment sales to be reported at amounts not approximating market.

71.     On February 5, 2024, the Company announced that the U.S. Department of Justice ("DOJ") initiated a criminal probe into the Company's accounting practices and the DOJ directed grand jury subpoenas to certain current and former employees.

**The Company's Nutrition Segment Was Key in Boosting Company Executive's Stock Bonuses and Bonuses Were Paid to Senior Executives Amid Government Investigations**

72.     Furthermore, according to an article published by Fortune in January 2024, *ADM Accounting Scandal Zeroes in on Nutrition Unit That Was Key In Boosting Exec Stock Bonuses Past $70 Million*.  The article stated in relevant part:

> ADM's board in 2020 and 2021 staked a considerable share of senior executives' stock award payouts to the profitability growth of its nutrition unit. The company blew past the goals for the first round of awards, helping the executives collect shares worth more than $70 million.

For the 2020-2022 period, average growth in the unit was 21.4%. Because the company also exceeded the top threshold for the second key metric — average adjusted return on invested capital across ADM — the company's seven top executives collectively received shares worth about $72 million in January 2023, filings show.

Seeing such a large weight on a narrow metric for equity incentives "is highly unusual," said Kevin Murphy, a finance professor at the University of Southern California's Marshall School of Business.

For awards set to run from 2022 to 2024, ADM's board replaced the nutrition unit metric with adjusted earnings per share, saying it is "one of the primary basis on which we set performance expectations for the year" and a widely used measure of corporate performance.

73.     On March 21, 2024, Reuters published an article, *ADM Pays Bonuses To Senior Executives in Midst of Government Investigation, Documents Show*.  The article stated in relevant part:

Senior executives at Archer-Daniels-Midland Co (ADM.N) the grain trader under government investigation for accounting issues, will receive millions of dollars in bonus compensation, according to an internal email seen by Reuters and Securities and Exchange Commission filings.

ADM had delayed paying performance bonuses to some executives until the company completed and audited its financial statements, Reuters previously reported. ADM published 2023 financial results on March 12, nearly two months later than initially planned, after conducting an internal investigation.

Senior executives' performance share unit compensation, which was awarded in 2021 and vested this week, will be paid out at 100% of the targeted amounts, according to an internal memo sent to employees by CEO Juan Luciano that was seen by Reuters on Wednesday. Based on the price of ADM common shares this week, the shares translate to millions of dollars in additional pay for senior executives, including Luciano.

DM's Nutrition division, its smallest of three business units and the one at the center of the accounting investigation, has played an outsize role in executive compensation. A change by ADM's Compensation and Succession Committee in

2020 tied half of long-term executive compensation to average operating profit growth of the Nutrition segment over a three-year period, with the remainder tied mostly to return on invested capital. Stronger-than-targeted performance in one category can offset subpar performance in the other.

Last year, senior executives received performance share units (PSUs) at twice the target payout, proxy statements showed. Seven ADM executives together received shares valued at nearly $69 million when they vested in February 2023.

SEC filings on Wednesday showed Luciano received 146,342 PSUs on March 18, valued at about $8.8 million based on the day's closing stock price, while executives Chris Cuddy and Greg Morris each received 29,269 PSUs worth more than $1.75 million each. ADM's board of directors' compensation committee certified the PSU awards, the SEC filings said. The committee has discretion to adjust the PSU bonuses "including to zero," according to SEC filings.

74.     A change by ADM's Compensation and Succession Committee in 2020 tied half of long-term executive compensation to operating profit growth of the Nutrition segment, according to ADM proxy statements. Previously, the long-term compensation had been based on ADM's adjusted earnings, return on invested capital and relative total shareholder returns, according to the filings.

75.     The compensation packages awarded to ADM executives that were closely tied to the performance of the nutrition division still stand, even after the Company announced several years of internal earnings adjustments following a financial probe along with two separate government investigations.

**The Company Finally Announces Fourth Quarter 2023 Earnings Two Months Later Than Initially Planned**

76.     On March 13, 2024, ADM announced its fourth quarter results, with a profit of $1.06 per share or $1.36 when adjusted for one-time gains and costs. Wall Street wasn't happy, however, with analysts expecting earnings of $1.42 per share.

77.     ADM announced that some sales between business units within the Company were not recorded at amounts approximating market value and corrected certain segment-specific financial information for previous financial statements from 2018 to 2023. ADM had overstated the Nutrition segment's annual operating profit by as much as 9.2% in that time.

78.     ADM reported a lower-than-expected fourth-quarter profit as oilseed processing and crop origination margins fell and as the company's Nutrition unit, the subject of internal and government investigations, posted a quarterly loss in an earnings statement delayed by nearly two months by the investigation.

79.     ADM announced the unit took a goodwill impairment charge of $137 million in 2023 in animal nutrition, a lower-margin portion of its Nutrition segment.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS FOR THE BOARD OF ADM

80.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

81.     Plaintiff brings this action derivatively on behalf of ADM to redress injuries already suffered and injuries that continue to be suffered  as a direct and proximate result of the misconduct alleged herein. ADM  is named as a nominal Defendant solely in a derivative capacity.

82.     Plaintiff will fairly and adequately represent the interests of the Company in enforcing and prosecuting its rights.

83.     Plaintiff did not make a demand on the Board to take remedial action on behalf of ADM against its own members because such a demand  would have been a futile, wasteful and useless act.  At the time this action was commenced, the Board was comprised of Defendants  (the "Board" or "Director Defendant").

**Demand Is Futile Because a Majority of the Board Allowed the Company to Issue False and Misleading Statements**

84.     The failures of ADM's controls and procedures, and the errors they produced, are red flags that should have alerted the Board  that the Company was releasing information to the public that was false  and  misleading.

85.     Each Board member was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Under the Company's Corporate Governance Guidelines, Board members had complete access to all officers and employees of the Company.

86.     The Board had a responsibility and obligation to assure that all press releases and filings of SEC reports were truthful and not materially misleading and that proper controls and other oversight procedures, including financial controls, were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are described herein but failed to do so.  The Board failed to disclose: (a) that the Nutrition segment's financial reporting and accounting practices did  not provide investors  with  an  accurate representation of ADM's performance and future  prospects, including reported operating profits; and (b) that the Nutrition segment's accounting practices created a heightened risk  of regulatory scrutiny and adverse impacts to ADM's business.  The Board exhibited a sustained and systematic failure to fulfill their fiduciary duties by actively participating or acquiescing in the wrongdoing alleged herein and/or by failing to implement adequate controls and procedures necessary to reasonably assure that the wrongdoing alleged herein did not occur.  Such failures could not have been an exercise of good faith business judgment.

**Substantial Likelihood of Liability for the Entire Board of Directors**

87.     By failing to satisfy their fiduciary duties, Defendants caused irreparable reputational harm to the Company and have exposed the Company to millions of dollars of liability in securities class action lawsuits.  Defendants caused or allowed ADM to mislead its shareholders and the general public.

88.     Each Director Defendant had a duty to diligently evaluate information provided to the Board by management and to ensure that reasonable systems of reporting existed for all relevant information, including but not limited to information regarding the Company's Nutrition business segment.  Director Defendants either evaluated this information and intentionally or recklessly rubber-stamped ADM's misrepresentations, or recklessly failed to ensure the disclosure of information necessary to prevent the statements from being materially false and misleading.

89.     Each of the Director Defendants face a substantial likelihood of liability in this action because of his/her failure, as a director, to assure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing materially misleading statements.  Based on the size, scope, and blatancy of the wrongdoing, the Individual Defendants must have known, or were reckless in not knowing, that the statements disseminated during the Relevant Period were materially misleading and/or omitted material information necessary not to make the statements materially misleading.

90.     Furthermore, Defendants Burke, Colbert, Brabander, Harrison, Moore and Sandler who are members of the Company's Audit Committee, breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's Nutrition business segment and the adequacy of its internal controls.  According to the Company's Audit Committee Charter, the

Audit Committee is responsible for, among other things, assisting the Board in the oversight of: (1) the integrity of the financial statements of the Company; (2) the effectiveness of the internal control over financial reporting; (4) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program; and (7) the performance of the Company's compliance function.

91.    Although the Audit Committee breached their fiduciary duties, the Board appointed the Audit Committee to oversee the Company's internal investigation.  Essentially, the Audit Committee was placed in charge of investigating itself.

92.    In connection with the internal investigation, the Company identified certain intersegment sales that occurred between the Company's Nutrition reporting segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions reporting segments that were not recorded at amounts approximating market. Furthermore, in connection with its internal investigation, the Company identified a material weakness in its internal control over financial reporting related to its accounting practices and procedures for intersegment sales. The material weakness resulted from inadequate controls that allowed for certain intersegment sales to be reported at amounts not approximating market. The Company admits in its SEC filings that the "absence of adequate controls with respect to the reporting of intersegment sales impacted the accuracy of the Company's segment disclosures and review controls over key inputs and assumptions utilized by the Company when performing the goodwill and long-lived asset impairment tests."

93.    Because each of the Director Defendants, including the Audit Committee members, face a substantial likelihood of liability for their unexculpated breaches of duty, demand is excused.

**The Compensation Committee Lacks Independence**

94.     The Compensation Committee members, Defendants Westbrook (Chair), Colbert, Collins and Schlitz lack independence because of the outsized bonuses they awarded to senior executives amid the accounting debacle that resulted in two separate government investigations.

95.     Because the Compensation Committee face a substantial likelihood of liability for their unexculpated breaches of duty, demand is excused.

**Defendant Luciano Lacks Independence as the Company's CEO**

96.      Defendant Luciano's livelihood depends on the substantial monetary and other compensation he receives from the Company.  Because of Luciano's employment with the Company, he is not considered an independent director.  Luciano is also beholden to the director Defendants who have influence over his compensation and continued employment with the Company.  Thus, demand upon him is futile.

**COUNT I**
**Against All Individual Defendants for Breach of Fiduciary Duty**

97.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

98.     The Individual Defendants, by reason of their positions as current or former officers and directors of ADM owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

99.     By virtue of their positions as ADM directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein

100.    Each Individual Defendant was required to: (a) use his or her ability to control and manage ADM in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of ADM rather than his or her own interests.

101.    Accordingly, the Individual Defendants breached their fiduciary duties to the Company.

102.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ADM has sustained significant damages, as alleged herein.

103.    Plaintiff, on behalf of ADM, has no adequate remedy at law.

### COUNT II

**Against Defendants Luciano, Luthar and Young for
Contribution and Indemnification  Under Sections 10(b)
and 21D of the Exchange Act**

104.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.    ADM and Defendants Luciano, Luthar and Young are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Luciano, Luthar and Young's willful and/or reckless violations of their obligations as officers and/or directors of ADM.

106.    Defendants Luciano, Luthar and Young because of their position of control and authority as officers and /or directors of ADM, were able to and did, directly and/or  indirectly,

exercise control over the business and corporate affairs of ADM, including the wrongful acts complained of herein and in the Securities Class Actions.

107.    Accordingly, these Defendants Luciano, Luthar and Young are liable under 15 U.S.C. § 78j(b),which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

108.    As such, ADM is entitled to receive all appropriate contribution or indemnification from Defendants Luciano, Luthar and Young.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on behalf of ADM against the Defendants, jointly and severally, as set forth herein as follows:

a)    Declaring that Plaintiff may maintain this action on behalf of ADM, and that Plaintiff is an adequate representative of the Company;

b)    Declaring that the Individual Defendants breached and/or aided and abetted the breach of their and other members of the Board's fiduciary duties to ADM;

c)    Determining and awarding to ADM the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereof;

d)    Directing ADM and the Individual Defendants to take all necessary actions to reform and improve ADM's corporate governance and internal procedures to comply with applicable laws and to protect ADM and its shareholders from a repeat of the damaging events described herein;

e)    Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and experts' fees, costs and expenses;  and

f)      Granting such other and further relief as the Court may deem just and  proper.


Dated: April 23, 2024                        Respectfully submitted,

Of Counsel:                                  FARNAN LLP

William B. Federman, Esq.                    /s/ Michael J. Farnan
FEDERMAN & SHERWOOD                          Brian E. Farnan (Bar No. 4089)
10205 N. Pennsylvania Avenue                 Michael J. Farnan (Bar No. 5165)
Oklahoma City, OK 73120                      919 North Market Street, 12th Floor
Phone: (405) 235-1560                        Wilmington, DE 19801
Fax: (405) 239-2112                          (302) 777-0300 (Telephone)
wbf@federmanlaw.com                          (302) 777-0301 (Facsimile)
                                             bfarnan@farnanlaw.com
                                             mfarnan@farnanlaw.com

                                             *Attorneys for Plaintiff*